Good morning, your honors. May it please the court, my name is Julie Connolly, and I represent the defelon appellant in this matter, Rafael Mulberto Celaya Valenzuela, who I'll refer to as Mr. Celaya. And if, with the court's permission, I'd like to reserve three minutes at the end. Yes. For rebuttal. I'm here today because Mr. Celaya was convicted of a crime which I submit he did not commit, and justice requires that that tragedy be undone. The evidence of this case, however generously construed in support of the verdict, does not support the conclusion that Mr. Celaya was part of a conspiracy to distribute or to possess with the intent to distribute cocaine, heroin, or methamphetamine in the District of New Hampshire or elsewhere. How do you get around the point which I understand to be undisputed that in part of the conspiratorial discussions, it was made clear that although the point of the FBI's phony scheme was to get drugs to Europe, some of those drugs would end up in the United States. Is that consistent with your argument? No, that's not. In the sense of I don't think the conspiratorial agreement included that some of the drugs would end up in the United States. In the record, there's only two instances in which the concept of distributing in the United States is introduced. Both times it's by the government agent McGowan, who posed as the leader of the undercover FBI crime family, and he was referred to as El Viejo. And he said, and the first time was at the April 2011 meeting at the Wentworth-by-the-Sea in Newcastle, New Hampshire. And the second time was after the drugs were delivered to Madrid and had been seized. And just before Celaya's three co-conspirators, alleged co-conspirators, were arrested, again, Agent McGowan said to Gutierrez Guzman, and I should go back, it was Guzman alone who was at the meeting in April of 2011 in New Hampshire. And then it was Guzman alone who was meeting with McGowan and some other agents when they said, they were talking about the success of the shipment, and the federal agent said, and we've already distributed the drugs, the cocaine it was, to, and they named various places in Europe and Japan and Canada and even New Hampshire at the last minute they added that. So my position is that that statement by the government agent to one co-conspirator, where there's no evidence at all in the record anywhere that it was ever raised when any other co-conspirator was present, is not evidence that the conspiracy agreed to distribute the drugs. What do you say to the fact that they discussed using American ports in part for the shipments to Europe and the fact that there was a shipment made in the United States? Well, the discussion of the ports, the use of American ports, is probably the most damning evidence in the case against my client. That arose at the August of 2010 meeting in Florida. And then there was also an exhibit, it's exhibit 24, and it's a code sheet that I think the government agent developed, which had names for the various ports. And that was introduced at the August 2010 meeting. But the reason that that does not evidence an intent to possess or an agreement to possibly possess within the United States, which is important, it's critical for an 841 violation, is that in March of 2011, the conspirators explicitly said that they rejected the use of going through the United States Eastern Seaboard ports. In fact, my client specifically said, we reject the use of Philadelphia, Felipe, we don't think that it's safe. And the government's contention that that change occurred only for the first shipment is actually nowhere supported in the record. The man, Jose Locio del Rio, who came in, in Madrid in 2011, the testimony is consistent that he changed the terms of the supply chain, he changed the pricing, and he changed the shipping. And he changed the pricing from to Europe. And if you look at its exhibits 28 and 29, which is the transcript of the March 2011 Madrid meeting, he speaks, there's a lot of talk about the various European ports that they'll go to. And there's no talk at all, as the government submits, that it was only because the first shipment was going to come from Ecuador, which was on the Pacific Ocean, and therefore they didn't want to go through the U.S. ports. There was talk about they didn't want to go through the Panama Canal because there was security risks with that. But that didn't have anything to do with their rejection of not wanting to use Eastern Seaboard ports. Well, what about the shipment to Detroit? The shipment to Detroit, I submit, is the only evidence that allowed the government to prove an A46 conspiracy. And it's critical because the shipment to Detroit was something that my client had no knowledge of. But he's part of the conspiracy. Why does he need to have knowledge in particular? And your client was, I guess, an insider. Wasn't he the one who went down to Mexico to speak with El Chapo? Well, there is, my client has disputed that. We disputed that in the trial. However, there was a FBI 302 where he said that he admitted that to Agent Heap. My client challenged the veracity of that. But there is, the district court found that he had wages, Miranda, and he admitted that. So let's assume that he did go to see El Chapo, and that would have been in April of 2011. My client was not involved after August of 2011. The idea, before, between the time that he was involved, which was up until August of 2011, there had never been any talk at all about heroin or methamphetamine. There had been no talk at all about any shipment to the United States for purposes of distribution in the United States. And in fact, the government filed a superseding indictment an entire year after my client, and the evidence of my client being involved in July of 2012, one month after the Detroit shipment. So I submit that the fact that the Detroit shipment happened so far after my client's involvement, there is no evidence at all of any discussion of possibly going to the United States. And my client never unequivocally dissociated himself in any way from the conspiracy. Well, with all due respect, Your Honor, he didn't formally withdraw because the law requires that he announce that to the conspirators, and that he affirmatively denounced his involvement by going to government officials. And under the circumstances here, neither one of those things were practical. Whether or not he... Well, they may not be practical, but isn't that the requirement for the argument that you're now making? Well, we are not actually making an argument that he formally withdrew from the conspiracy for purposes of saying that we made an error by not asking for a withdrawal instruction. So isn't he then hoisted on that situation that is part of the conspiracy, and he's still part of the conspiracy, so he's stuck? I don't think so, because I think the conspiracy law requires that you have the specific intent to commit the underlying crime. And here, the underlying crime is an 841A violation. The 841A violation requires... Yes, but there was discussion of also selling drugs in the United States. There wasn't any discussion of selling drugs in the United States. There's actually nowhere in the record that there was. This case is not like United States versus Gary, where there were two conspirators talking to two agents about possibly bringing the drugs into the United States. And in that situation, even though the conspirators were going to do it, the agents were going to, both conspirators were present, that it was only Guzman, Gutierrez Guzman, who was at the meeting in April of 2011. And significantly, that idea of possibly distributing in the United States only arose... the first time it was ever introduced in the record by the federal agent in April of 2011 was one month after the Madrid meeting, when the conspiracy had been unequivocal that it was not going to use the United States ports. So now the government realized, okay, we're not going to get possession in the United States, so we're going to have to figure out a way to get distribution in the United States. And the government introduced that element then. There's no evidence that supports the conclusion that the conspirators wanted to use the LVA host people to distribute their drugs to the United States. Other evidence, I think, that's relevant to that point is the payment terms. The payment terms did not require any kind of further distribution by the government. The government, the deal was, even when it was 50-50, the government was going to get half of the proceeds, half of the drugs, and the conspiracy was going to get the other half. But after Madrid, the conspiracy said, we're going to just... you take 20% of the drugs, and that's your payment for providing us with security to get this delivered to Spain, and we're going to take the 80%, and we're going to distribute it to our contacts in Europe. In fact, Agent Heap, who was the lead federal agent on the case, testified to that effect. And we cite that in our brief. I think it's footnote 5 on page 18 or 19. So the idea that the conspiracy was relying on any kind of distribution by the government, you know, by El Viejo's group, to support the conclusion that it had agreed to distribute in order to establish the 841 violation, it's just not supported by the evidence. And clearly, my client had no knowledge of that. And even though a conspirator can certainly be saddled with the... he doesn't need to know every step along the lines of... I mean, every step of what happens in a conspiracy. The conspirator has to have the specific intent to commit the underlying violation. And here, there's no evidence that he had the intent to possess in the United States or distribute in the United States. Thank you, Your Honor. Good morning. Seth Avery for the United States. I think that the argument we just heard suffers from a fundamental flaw that I want to make clear at the outset. The notion seems to be that the entire conspiracy was about the single shipment of drugs to Spain in July of 2012. That just isn't what the conspiracy was. The conspiracy was a desire to form a long-term distribution business between the chopper organization and what I call the FBI organization. It's a sting, but the FBI organization was supposed to exist over years. That's what was agreed to. It was a first shipment. There always has to be a first shipment in any business. That does not define the contours of the conspiracy. But yet, the argument we just heard seems to operate off of that premise that's, I think, incorrect. When you look at what the conspiracy really was, which is this multi-year business objective to have numerous shipments of drugs, then I think the evidence looked through that prism shows why there is sufficient jurisdictional access to the United States. So let me talk about the seaports, as Judge Stahl brought up. The initial discussions were the chopper organization said, we'd like to do it by airplanes. The FBI organization said, we'd rather use shipping channels into the United States ports, and then the drugs would go over to Europe. That seems to be agreed to. I put in my brief the discussions that suggest that was the agreement, the defendants at those meetings. Then in March 2012, there is a meeting where the chopper organization says, the very first shipment, we'll do that one. We'd like to do that one directly to Europe. Because it's coming from Ecuador, I disagree with my colleague. This is in the record. It's coming from Ecuador, and to get it to the eastern seaport, it has to come through the Panama Canal. That creates a risk of the drugs being robbed. We'd like to go for this first shipment directly to Europe, and that's agreed to. Now, there's other talk in the record about, this is the first shipment, the drugs are always going to come from different places. That's the chopper organization saying, the drugs are always going to come from different organizations. We can discuss delivery over time. So the point is, the eastern seaport idea was never off the table. It wasn't done for shipment one, but that does not mean that a jury couldn't conclude that that was part of the overall conspiratorial objective. Was there any direct evidence that they intended more than a European connection, that this was a, as you say, a multi-year conspiracy, a long-time business relationship? Is there anything in the record, other than the shipment to Detroit, and the conversation about the American courts, which would lead one to believe that this was a broader conspiracy than one simply to ship drugs to Europe? Oh, sure. Every time the defendant, Mr. Guzman, who are the leaders of this thing, are meeting with El Viejo, the head FBI agent, they say things like, we now have trust. This is going to be a multi-year relationship. This is not going to be a flame in the pan, is the words that the defendant uses. All this idea that this is a whole sum total of this. But you could have a long-term business relationship which only had Europe in mind. That's true. So the evidence is that in April 2011, Guzman, who is the sort of chapeaued agent on the ground, says to El Viejo, these drugs are being distributed in Europe, Canada, United States, and he lists a bunch of other places, to which Guzman says, yes, I guess. That's right. So that's evidence that the drugs intended to start in Europe, they would go through the eastern United States to Europe, and then Guzman is telling his compatriot on the other side, and some of it's going to come back and ultimately be distributed in the United States. To which Guzman says, yes. If Guzman were the defendant here, you'd have quite an argument there. What is your response to her argument that a conversation to which one conspirator was a party is not adequate evidence that another conspirator knew it and intended to effect it? In August 2011, Guzman, this is a meeting in Boston, Guzman, the defendant's not in the room, Guzman is talking to the FBI agent and he's describing this defendant's role and he says, the defendant's paraphrasing, but he's a good guy, but what's in quotes is he knows everything. Now that's after the April 2011 meeting. So when Guzman, the head person, is telling the FBI that the defendant knows everything, a jury could conclude that knowing everything means understanding that in April 2011 it was discussed that some of these drugs are going to go to the United States, that that's an important fact. A jury at least could conclude that that means that's one of the things that he knows when he knows everything. So that's United States seaports. I do think the interesting legal question here is for jurisdictional nexus, is it necessary that the defendant have knowledge of the act that triggers the United States or is it just enough that he agreed to distribute drugs? I cited the only case I could find on that topic, which was the Southern District of New York case, which suggests you don't need, the particular conspirator does not need to know those acts that touch the United States as long as he knows he's agreed to engage in drug possession and distribution. So that's where the standard of review comes in here. This issue was not at all raised timely in the district court. It was not raised until six months after the trial. So to me, if the legal answer is the defendant, you don't need knowledge of the United States, you just need knowledge of drug distribution or drug possession, drug intention to distribute, this case isn't even close because there was distribution in the United States. Guzman distributed heroin in the United States to further the objectives of the conspiracy. The FBI was mad. This thing was taking way too long. They had put out costs. The FBI was complaining. Guzman's response is, we'll pay you back and we're going to pay you back in heroin. And that heroin was actually delivered in June 2012 to the United States. There is no evidence the defendant knew of a specific act. So if you don't think knowledge is required, that ends it. However, what's required is that even if you think sort of some kind of knowledge is required, as Judge Stahl pointed out, conspirators are responsible for those acts that are reasonably foreseeable. It's reasonably foreseeable to this defendant that what's necessary to have a long-term drug relationship is trust between parties. And it's foreseeable to this defendant that when the FBI organization says, we're mad. We're out of a lot of money because you told us you were going to deliver drugs and you didn't. And now we paid all this money to deal with all the logistics. It's really foreseeable to this defendant that they would do something to keep the trust. And what Guzman decided to do was to deliver cocaine, I'm sorry, to deliver heroin in the United States. That defendant's responsible for that, even if he didn't directly know that that specific act was going to be how Guzman would achieve that reasonably foreseeable goal of keeping peace and happiness between the parties in the long-term business relationship. So as the government sees it, the defendant had knowledge of the USC ports. A jury certainly could have concluded that that remained part of the conspiratorial plan throughout. Was it used for shipment number one? No. Does that mean that a jury couldn't conclude that that was always on the table to be done later? Of course it could have. And that would be enough. Two, I think the evidence allows a reasonable jury to conclude that the defendant knew the drugs, one of the ultimate locations where these drugs were going to go was the United States. Guzman says, okay, and then he represents that this defendant knows everything about what's going on. Well, that's part of everything. And third, the drugs were actually delivered to the United States for an objective reasonably foreseeable to the conspiracy. And that is to keep peace and happiness between the parties. So on all those grounds, I think there is a sufficient basis for this jury to have concluded that the defendant was part of the conspiracy. Turning from the extraterritorial jurisdiction issue to the venue issue, the law, I think, is clear that manufactured venue is not a doctrine. It's certainly not a doctrine this court has adopted. The Second Circuit has a case that hinted at the doctrine. And in a more recent case, it says, well, after hinting at it 25 years ago, we've never found a case that we've overturned on the basis of this idea of manufactured venue. The Fourth Circuit expressly rejected it. And Judge Wilkinson did, I thought, a nice job in that opinion explaining why, that it really confuses different ideas. There is a doctrine in manufactured jurisdiction. You can't create a crime by the government creating that element that is jurisdictional. And there's entrapment, which is to get someone to do a crime that they otherwise would not have done or been predisposed to do. Manufactured venue is something different. As Judge Wilkinson pointed out, it morphs those in and creates this third doctrine, which doesn't exist, because venue is not about committing the crime. Venue is about where the crime is going to be tried. And the point there was that Judge Wilkinson's point was that that's not what those other two doctrines are about. And there's a remedy if you think that venue has been created in a place where you'd like to not be tried. You can move under Rule 21, under form nonconvenience, to have the case tried in a place that's more convenient to you as a defendant. From a policy perspective, however, he discussed that having this kind of manufactured venue doctrine does limit government's ability, law enforcement's ability, to choose how it's going to operate sting operations, because they're limited to identifying the locations and the point being that we don't want to do that. We don't want to stop law enforcement from having the ability to pick those places that they think are safest or most advantageous to run these kinds of operations. So there was venue. The defendant flew into Boston. The cooperator in the case drove him to New Hampshire an hour away, where they had a meeting at a hotel that was important to the conspiracy. He was told he was in New Hampshire. The bluesman was told he was in New Hampshire. He did not object to being in New Hampshire. He went back to the airport and flew off. Clearly, it was venue in Boston, because the August 2011 meeting was in Boston. It was a D.C. Circuit case that points out that even if the D.C. Circuit rejected manufactured venue, but to the extent it would even consider it, then it's really not the appropriate kind of case we're talking about. There clearly was venue in the neighboring district, and you could move one district away. That's just not the kind of case where manufactured venue makes a lot of sense. So in the government's view, the judge was correct to not instruct on that basis. So that's the manufactured venue argument. There are two sentencing arguments that I'll just touch on really briefly. The defendant says that he should get a minor role adjustment. That's not true, because he had a significant role. He was not a low-level player. He was meeting with the higher-ups on the FBI organization side. He was in charge of the money laundering aspect of the business arrangement. He had significant operations. He does not appear after August 2011 at any more meetings. That seems to be sort of the nub of the defendant's argument, and it was the nub of the defendant's argument at trial before the jurisdictional issue came up. Judge Stahl is right to point out that withdrawal never happened, and they don't argue withdrawal. But it's also an overstatement to say just because he didn't show up at meetings anymore, he was no longer involved. You know, this was a long-term business relationship. Different people came to meetings from the chapel organization. So is it true that he no longer had an on-the-ground meeting involvement after August 2011? Yes, but there's also no clear evidence that he was out either. So, you know, it's unclear as to that. But in any event, he was involved in important aspects of the conspiracy. He wasn't, therefore, entitled to a minor role. And finally, did he receive the sentence longer than Guzman? It does not make the sentence substantive reasonable because, you know, this defendant went to trial. Guzman did not. And this court has many cases that say that, you know, to the extent you're trying to compare yourself to a co-defendant in the same case, it has to be an apples-to-apples comparison. And when one goes to trial and one does not, that's a basis for distinction. I mean, their sentences are not hugely variant. There's, I think, an 18-month difference between the sentences. And that might have been made up in part by acceptance of responsibility, I assume. Correct, correct. If there are no further questions from the court, I'll rest my brief. Thank you. Thank you, Your Honors. I'd like to address a couple of the points the government just made. First of all, with respect to their point that the agreement was to establish a long-term relationship to supply cocaine to Europe, the defense has never disputed that. So this idea that we were focused on the first shipment is just not part of anything that we argued before the district court or that we've argued on appeal. The need to establish trust and peace, which Attorney Avery just referenced with respect to why they did the Detroit shipment, both the district court and the government below conceded that Mr. Celaya had no knowledge. The government conceded that Celaya had no knowledge of the Detroit shipment. The district court found that Celaya had no knowledge of the Detroit shipment. It wasn't included in the PSR for purposes of determining the drug quantity for sentencing him. So the fact that the Detroit shipment, which I submit is the sole basis for this 846 conspiracy to have had a jurisdictional nexus, the fact that that occurred can't be attributed to Mr. Celaya. And simply because a co-conspirator said in August of 2011 that Mr. Celaya knows everything, that doesn't overcome the concession of the government and all of the other evidence that he had no idea about the Detroit shipment, that the Detroit shipment was a one-off. It wasn't even Guzman took sole responsibility for it, both in the meeting of May 2012 in Phoenix, Arizona, and then again in the final meeting in Madrid in August. Excuse me, are you taking the position that in what you call a one-off, the only member of a conspiracy who can in effect be held responsible as a matter of evidence for the one-off is a member of the conspiracy who actually knew about it? Is that your position? No, that's not my position. And I don't understand what your position is. My position is that up until that happened, there was no discussion at all of heroin or methamphetamine or shipment to the United States. The discussion was all shipment of cocaine from South America to Europe. And when that happened, I said that one conspirator took the initiative to do it, which was Guzman. That established the violation of 841. And then the conspiracy that occurred continued after that, I submit, the agreement to continue to ship the drugs, the 846 agreement can rely on that 841 violation for purposes of upholding the conspiracy with respect to Zasuedo and Soto and the other co-defendants in the summer of 2012. But it doesn't work to retroactively pull in an alleged co-conspirator. Okay, thank you very much.